Judy Floyd BROWN and Leslie Brown, individually and on behalf of their minor son, Leslie Harrelson Brown, Petitioners,

v.

**SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 90–1769V.

United States Court of Federal Claims.

Sept. 22, 1995.

Sandra B. Ribes, Baton Rouge, LA, for petitioners.

Tarek Sawi and Aristia Karas, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for respondent.

## OPINION

MILLER, Judge.

This matter is before the court on respondent's objections to the special master's decision on remand awarding compensation for an encephalopathy under 42 U.S.C. §§ 300aa–11(c)(1)(C)(i), –11(c)(1)(D)(i) of the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa–1—300aa–34 (1988 & Supp. V 1993), *as amended*, 42 U.S.C.A. §§ 300aa–1—300aa–34 (West Supp.1995) (the "Vaccine Act"). The issues to be decided are 1) whether the special master's decision is in accordance with *Shalala v. Whitecotton*, ——— U.S. ———, 115 S.Ct. 1477, 131 L.Ed.2d 374 (1995); 2) whether post-vaccination seizures are sufficient to constitute a first symptom or manifestation of onset of encephalopathy; and 3) whether the special master is permitted to change her position on whether petitioners proved the onset of encephalopathy.

## FACTS

The following facts are a matter of record. They largely repeat the facts discussed in this court's prior order. *Brown v. Secretary of DHHS*, No. 90–1769V, 1993 WL 373782 (June 14, 1995) (unpubl.) (ordering remand). Judy and Leslie Brown ("petitioners") filed a vaccine-related injury claim for compensation on behalf of their minor son, Leslie Harrelson Brown. Leslie was born on April 16, 1985. On June 17, 1985, at two months of age, Leslie received his first diphtheria-pertussistetanus (DPT) vaccination. Following the first vaccination, Leslie experienced a choking spell later diagnosed as a seizure. On September 4, 1985, Leslie received his second DPT vaccination after which, according to petitioner Mrs. Brown, he "[had] a high fever, cried constantly ... screamed ... and had choking spells." *Brown v. Secretary of DHHS*, No. 90–1769V, slip op. at 3 (Spec. Mstr. Sept. 9, 1993). Leslie, at the age of 10, continues to have seizures and suffers from encephalopathy. Claiming that both of these disorders are vaccine related, petitioners sought full compensation for Leslie's present condition.

A hearing on petitioners' claim was held on March 23, 1993. On September 9, 1993, Special Master Laura D. Millman issued a decision that determined entitlement for compensation in favor of petitioners under the Vaccine Act. The special master found that petitioners had established their case for a presumptively vaccine-related seizure disorder, but not for vaccine-related encephalopathy. Specifically, the special master found "no basis in the medical records or the expert medical testimony to conclude that Leslie acquired symptoms of an encephalopathy within three days after receipt of either DPT vaccination." *Id.* at 17.

The parties thereafter initiated negotiations for the amount of compensation. They could not agree, however, about the extent to which Leslie's current medical and developmental problems were due to seizure disorder, and therefore compensable, or due to his encephalopathy, and in the Secretary's view not compensable. Unable to resolve their disagreement, the parties returned to the special master for clarification of her position regarding the extent of respondent's liability for Leslie's current condition.

Subsequently, on December 7, 1993, the special master issued an order to the effect that the Secretary should compensate Leslie

for all of his existing health problems. The special master did not differentiate between disorders attributed to Leslie's seizure disorder and those attributed to his encephalopathy. In that order the special master explained her reasoning: "In its entitlement decision, the court did not hold that Leslie's encephalopathy began on-Table following his DPT vaccination. However, the court accepts that Leslie's seizure disorder is part of an encephalopathic process." *Brown v. Secretary of DHHS*, No. 90–1769V, slip. op. at 1 (Spec.Mstr. Dec. 7, 1993).

The parties renewed discussions concerning the amount of compensation. On September 16, 1994, in a *sua sponte* Supplement to Decision (to the September 9, 1993 decision), the special master ruled that "[i]n light of recent case law, particularly *Whitecotton v. Secretary of DHHS*, 17 F.3d 374 (Fed.Cir. 1994), *petition for cert. filed*, this court has reassessed its position that petitioners did not prove encephalopathy and now holds that Leslie had both an on-Table RSD [residual seizure disorder] and an on-Table encephalopathy." *Brown v. Secretary of DHHS*, No. 90–1769V, slip op. at 1–2 (Spec.Mstr. Sept. 16, 1994). Citing *Whitecotton* as precedent, the special master held that the fact that the encephalopathy may have preceded the vaccination is irrelevant if the cause of the encephalopathy is unknown. *Id.* at 3.

■ After 18 months of negotiations without a comprehensive settlement of damages, the special master resolved the matter of compensation in a final order entered on March 31, 1995, which included damages for seizure disorder and encephalopathy. Respondent objected to the special master's decision on two grounds. First, respondent interpreted the special master's September 16, 1994 supplemental decision holding that "the fact that Leslie's encephalopathy may have preceded his DPT vaccinations is irrelevant if the cause is unknown[.]," as being based on the *Whitecotton* decision that the Supreme Court recently reversed. *Whitecotton v. Secretary of DHHS*, 17 F.3d 374 (Fed. Cir.1994), *rev'd sub nom. Shalala v. Whitecotton*, —— U.S. ——, 115 S.Ct. 1477, 131 L.Ed.2d 374 (1995). The Supreme Court held that a claimant who seeks compensation under the Vaccine Act must show not only that she experienced the symptoms of injury after receiving vaccination, but also that she had no symptoms of that injury before vaccination. 115 S.Ct. at 1478. Second, respondent objected to the special master's finding in her December 7, 1993 order that Leslie's seizure disorder is a part of an encephalopathic process.

On June 14, 1995, this court remanded the case to the special master instructing her to look at the law as propounded by the Supreme Court in *Whitecotton* and "apply it to resolve the remaining issue in the case, *i.e.*, whether the evidence supports a finding of an on-Table encephalopathy." *Brown*, No. 90–1769V, slip op. at 5 (Fed.Cl. June 14, 1995). On remand the special master, relying heavily on the testimony of Dr. Judith Fishbein, found: "Leslie's pre-vaccination normalcy, his post-vaccination seizures, his dramatic decline in head circumference over time, and his delay in development all indicate post-vaccinal encephalopathy whose onset occurred at the time of his first . . . seizures on the evening of his first DPT vaccination." *Brown v. Secretary of DHHS*, No. 90–1769V, slip op. at 8 (Spec.Mstr. July 5, 1995). Furthermore, the special master found "that petitioners have satisfied their burden in proving both an on-Table onset of . . . encephalopathy, and the absence of pre-vaccination symptoms of encephalopathy. . . ." as required by *Whitecotton*. *Id.*

Respondent again objected to the special master's findings on remand, asserting that the special master failed to properly apply *Whitecotton*. Specifically, respondent argued that, under the Vaccine Act, seizures cannot constitute a first symptom of the onset of encephalopathy because seizures do not prove sufficiently the onset of encephalopathy and their use as a first symptom of encephalopathy would read the term "onset" out of the statute and merge "Residual Seizure Disorder" and "Encephalopathy" into one category. *See* 42 U.S.C. § 300aa–11(c)(1)(C)(i); 42 U.S.C. § 300aa–14(a)I.B.

## DISCUSSION

### 1. *Standard of review*

On review of a decision by a special master, the United States Court of Federal

Claims is authorized to "set aside any findings of fact or conclusion[s] of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law...." 42 U.S.C.A. § 300aa–12(e)(2)(B). The court reviews issues of fact finding under the arbitrary and capricious standard, questions of law "under the 'not in accordance with law' standard, and discretionary rulings under the abuse of discretion standard." *Neher v. Secretary of DHHS*, 984 F.2d 1195, 1198 (Fed. Cir.1993) (quoting *Munn v. Secretary of DHHS*, 970 F.2d 863, 870 n. 10 (Fed.Cir. 1992)); *see also Youngblood v. Secretary of DHHS*, 32 F.3d 552, 554 (Fed.Cir.1994). According to the Federal Circuit, " 'arbitrary and capricious' is a highly deferential standard of review." *Hines v. Secretary of DHHS*, 940 F.2d 1518, 1528 (Fed.Cir.1991). Thus, "[i]f the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Id.*

### 2. *Statutory requirements*

Under the Vaccine Act, a petitioner can establish a prima facie case for compensation by showing that one

> sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table in association with [a] vaccine ... and the first symptom or manifestation of the onset or of the significant aggravation of any such illness, disability, injury or condition or the death occurred within the time period after vaccine administration set forth in the Vaccine Injury Table....

42 U.S.C. § 300aa–11(c)(1)(C)(i). The Vaccine Injury Table states that the "[t]ime period for first symptom or manifestation of onset or of significant aggravation after vaccine administration" for encephalopathy is "3 days." 42 U.S.C. § 300aa–14(a)I. The qualifications and aids to interpretation state that "[t]he term 'encephalopathy' means any significant acquired abnormality of, or injury to, or impairment of function of the brain." 42 U.S.C. § 300aa–14(b)(3)(A). The neurologi-

cal signs and symptoms of encephalopathy include "changes lasting at least 6 hours in level of consciousness ... high pitched and unusual screaming, persistent unconsolable crying, and bulging fontanel...." *Id.*

■ If a petitioner demonstrates that an on-Table injury occurred within the required period, entitlement to compensation is established, unless there is a preponderance of evidence that the injury is due to factors unrelated to the vaccination. 42 U.S.C. § 300aa–13(a)(2). Thus, the Vaccine Act relieves a petitioner of the burden of proving actual causation. As the Supreme Court noted, "the rule of prima facie proof turns the old maxim on its head by providing that if the *post hoc* event happens fast, *ergo propter hoc.*" *Shalala v. Whitecotton*, — U.S. —, —, 115 S.Ct. 1477, 1479, 131 L.Ed.2d 374 (1995).

### 3. *Effect of Whitecotton*

On remand this court instructed the special master to reconsider this claim for compensation in light of the Supreme Court's ruling in *Whitecotton*. Respondent argues the decision of the special master is inconsistent with *Whitecotton*. In *Whitecotton* the Vaccine Act claimant exhibited symptoms of encephalopathy prior to vaccination. — U.S. at —, 115 S.Ct. at 1479. Based on this fact, the special master denied compensation. However, the Federal Circuit reversed, holding that a claimant demonstrates a first symptom or manifestation of onset whenever he shows that an on-Table injury occurred within three days of vaccination, regardless of evidence that the condition existed prior to vaccination. *Whitecotton*, 17 F.3d at 376–77. The Federal Circuit was in turn reversed by the Supreme Court, which held:

> If a symptom or manifestation of a table injury has occurred before a claimant's vaccination, a symptom or manifestation after the vaccination cannot be the first, or signal the injury's onset. There cannot be two first symptoms or onsets of the same injury. Thus, a demonstration that the claimant experienced symptoms of an injury during the table period, while necessary, is insufficient to make out a prima

facie case. The claimant must also show that no evidence of the injury appeared before the vaccination.

— U.S. at ——, 115 S.Ct. at 1480.

In the case at bar, the special master's September 9, 1993 decision initially denied compensation for encephalopathy based on a finding that petitioners did not sufficiently prove that 1) there were no pre-vaccination symptoms of encephalopathy; or that 2) "Leslie acquired symptoms of an encephalopathy within three days after receipt of either DPT vaccination." *Brown v. Secretary of DHHS*, No. 90–1769V, slip op. at 17 (Spec. Mstr. Sept. 9, 1993). After the Federal Circuit's decision in *Whitecotton*, the special master, in her September 16, 1994 opinion, reevaluated her conclusion. Based upon the Federal Circuit's view—that a petitioner need not prove the absence of symptoms prior to vaccination—the special master found that Leslie's seizures after his two vaccinations constituted sufficient evidence of the onset of encephalopathy. Furthermore, the special master ruled that she need not examine whether there were pre-vaccination symptoms of encephalopathy. *Brown v. Secretary of DHHS*, No. 90–1769V, slip op. at 3 (Spec.Mstr. Sept. 16, 1994).

After the Supreme Court reversed the Federal Circuit, the special master on remand was called on once again to reexamine her findings. In her July 5, 1995 decision, the special master again found sufficient evidence of the onset of encephalopathy within three days of vaccination. In addition, upon addressing specifically the issue of whether there was evidence of encephalopathy prior to vaccination—as required by the Supreme Court—she found: "What the court sees . . . is a child who was neurologically normal before vaccination, and neurologically abnormal after vaccination. . . ." *Brown v. Secretary of DHHS*, No. 90–1769V, slip op. at 7 (Spec.Mstr. July 5, 1994). Thus, the special master made findings consistent with the Supreme Court's ruling in *Whitecotton*, such

that the absence of evidence of pre-vaccination encephalopathy allows for recovery in this case. Although the special master twice reexamined her decision because of the fluctuating rulings in *Whitecotton*, in the end that case involved a wholly different fact situation (pre-vaccination symptoms of encephalopathy), and respondent is incorrect in arguing that *Whitecotton* somehow invalidates or undermines the special master's last decision.[1]

### 4. *Seizures as the first symptom or manifestation of onset*

Respondent does not dispute liability and the compensation awarded for Leslie's residual seizure disorder and resulting complications; rather, liability for Leslie's encephalopathy is in contention. Respondent argues that Leslie's encephalopathy did not occur within three days of a DPT vaccination, and therefore no compensation should be awarded for complications, or sequela, of that disorder. The basis of respondent's argument is that seizures alone cannot constitute a first symptom or manifestation of onset of encephalopathy.

When this court remanded the case, the special master was directed to reevaluate the evidence in light of the Supreme Court's ruling in *Whitecotton*. *See Brown v. Secretary of DHHS*, No. 90–1769V, slip op. at 6 (Fed.Cl. June 14, 1995). Following this instruction, the special master reexamined the evidence and issued a decision reaffirming that petitioners had proved on-Table encephalopathy within three days of vaccination. In reaching her decision, the special master determined that petitioners' expert, Dr. Fishbein, provided strong and credible testimony that Leslie's adverse reaction to vaccination was evidence of the onset of encephalopathy. The special master considered the testimony of respondent's expert, Dr. Joel Herskowitz, to be vague, speculative, and less credible. *Brown*, No. 90–1769V, slip op. at 3–7

---

1. Respondent also argues that a seizure cannot constitute a first symptom of onset of encephalopathy based partly on the emphasis the Supreme Court placed on the term "onset" in its decision in *Whitecotton*. —— U.S. at ——, 115 S.Ct. at 1481. Whether under the Vaccine Act a seizure qualifies as a sufficient reaction to constitute a first symptom or manifestation of the onset of encephalopathy is discussed above. Yet, it must be noted that the Supreme Court in *Whitecotton* did not address this issue.

(Spec.Mstr. July 5, 1995). It is not this court's role to second-guess the special master's fact findings and credibility assessments. Rather, the court is to apply a deferential standard of review, asking only whether the special master's fact-finding decision was arbitrary and capricious. *Neher,* 984 F.2d at 1198. The special master in this case evaluated conflicting testimony on a factual issue and made a reasonable determination based on the evidence.

Respondent argues that the special master's finding that seizures can be a first symptom of encephalopathy was arbitrary and capricious based upon a report of the Institute of Medicine, which states that "[s]eizures in themselves are not sufficient to constitute a diagnosis of encephalopathy...." *Haim v. Secretary of DHHS,* No. 90–1031V, slip op. at 9, 1993 WL 346392 (Spec.Mstr. Aug. 27, 1993). However, this same report further states: "Encephalopathies are frequently accompanied by seizures.... Most of the studies of neurologic events following pertussis immunization have included both encephalopathy and seizure as outcomes of interest." Institute of Medicine, *Adverse Effects of Pertussis and Rubella Vaccines,* 87–88 (Nat'l Academy Press 1991).

▇ In contrast, the issue of whether seizures can constitute, as a matter of law, a first symptom or manifestation of onset under the Vaccine Act is a question to be reviewed under the "not in accord with the law standard." *Neher,* 984 F.2d at 1198. In resolving this question, the court first notes that more evidence exists concerning the onset of encephalopathy in this case than seizures alone. The special master noted, in her review of the facts and testimony in the September 9, 1993 decision, that Leslie "developed a high fever, cried constantly ... screamed ... and had choking spells" after his second vaccination. *Brown,* No. 90–1769V, slip op. at 3 (Spec.Mstr. Sept. 9, 1993). This list of reactions correlates with three of the signs and symptoms of encephalopathy delineated in the Vaccine Act's qualifications and aids to interpretation. *See* 42 U.S.C. § 300aa–14(b)(3)(A). While the special master's July 5, 1995 decision discusses only the relevance of the choking spells

(which were later diagnosed as seizures), it is important to note that the record contains additional evidence supporting the special master's final determination.

The Vaccine Act enables a petitioner to establish a prima facie case for vaccine-related injury by showing that "the first symptom or manifestation of the onset ... occurred within the time period after vaccine administration set forth in the Vaccine Injury Table...." 42 U.S.C. § 300aa–11(c)(1)(C)(i). The Table lists encephalopathy as one of the qualifying injuries if its onset occurs within three days of vaccination, 42 U.S.C. § 300aa–14(a)I.B, and the qualifications and aids to interpretation list certain symptoms that indicate the onset of encephalopathy. 42 U.S.C. § 300aa–14(b)(3)(A). Although seizures specifically are not listed in this section, the statute states that individuals suffering from encephalopathy often suffer from prolonged loss of consciousness "with or without convulsions." *Id.* Furthermore, the Vaccine Act cautions that the symptoms therein listed "in and of themselves are not conclusive evidence of encephalopathy." *Id.* The clear implication of this language is that no single concrete set of symptoms invariably indicates the onset of encephalopathy. Rather, the special master is to look for these and other possible symptoms and make a reasonable evaluation of the medical and other evidence.

Respondent offers a host of arguments why seizures alone cannot constitute evidence of the onset of encephalopathy. Ignoring for the moment the fact that the record contains some additional evidence of the onset of encephalopathy, nothing in the Vaccine Act or the case law prevents a special master from looking at the totality of the evidence in a particular case and determining that seizures are a first symptom or manifestation of the onset of encephalopathy.

Respondent first argues that Leslie's change in head circumference and developmental delays may only be used by the special master as evidence of the onset of encephalopathy if these changes occurred within three days of vaccination. Respondent urges an unrealistic standard. It would be highly unlikely for observable changes in head cir-

cumference or developmental progress to be present a mere three days after vaccination. Moreover, the special master, by noting these conditions, simply was trying to establish a link between Leslie's seizures and his encephalopathy by demonstrating that Leslie exhibited no neurological problems before vaccination, while after the vaccination he suffered severe seizures and encephalopathy. The special master found that these seizures were a first symptom of the onset of Leslie's encephalopathy, which is exactly what the Vaccine Act requires.

■ Next, respondent argues that allowing compensation for encephalopathy based upon seizures alone would effectively read the term "onset" out of the Vaccine Act. *See* 42 U.S.C. § 300aa–11(c)(1)(C)(i). Such an interpretation would run afoul of the Supreme Court's ruling in *Whitecotton* that "[t]he key to understanding ... [these statutory provisions] is the word 'onset.'" —— U.S. at ——, 115 S.Ct. at 1481. The Supreme Court made this statement in the context of a case in which symptoms of encephalopathy prior to vaccination were present. The Court was concerned that merely looking for symptoms within the Table period, without considering pre-vaccination symptoms, would nullify the "onset" requirement of the Vaccine Act.[2] However, when no evidence of encephalopathy prior to vaccination exists, as in this case, accepting seizures as the first symptom of the beginning, or the "onset," of encephalopathy cannot be construed as reading "onset" out of the Vaccine Act.

■ Next, respondent argues that to qualify for compensation an injury must be "sustained" during the period set by the Table, 42 U.S.C. § 300aa–11(c)(1)(C)(i), and be an "acquired" abnormality of the brain, 42 U.S.C. § 300aa–14(b)(3)(A). Respondent contends that a finding of compensable encephalopathy based upon seizures cannot meet these statutory requirements. However, the special master found, based on credible evidence, that the vaccination caused the injury to be "sustained" and that the injury was "acquired" due to the vaccination, because Leslie showed no symptoms of encephalopathy prior to the vaccination. The special master's reliance on seizures as evidence of encephalopathy is not inconsistent with these statutory requirements.

Respondent further argues that allowing seizures to constitute evidence of encephalopathy essentially merges the separate injuries of "Encephalopathy" and "Residual seizure disorder" into one category. *See* 42 U.S.C. § 300aa–14(a)I.B., D. The Vaccine Act, however, does not rule out a finding that a child suffers solely from a seizure disorder or solely from encephalopathy. Yet, in those cases wherein seizures occur after vaccination, the evidence shows that encephalopathy is present, and no indication is evident that this encephalopathy existed pre-vaccination, it is not improper to find that the vaccination caused the encephalopathy.

Finally, respondent argues that the special master's decision is inconsistent with her own ruling in *Haim*, No. 90–1031V (Spec.Mstr. Aug. 27, 1993), and the court's ruling in *Skinner v. Secretary of DHHS*, 32 Fed.Cl. 196 (1994). In *Haim* the special master quoted the Institute of Medicine's 1991 report which stated: "Seizures in themselves are not sufficient to constitute a diagnosis of encephalopathy....", Institute of Medicine, *Adverse Effects of Pertussis and Rubella Vaccines* 87 (Nat'l Academy Press 1991), to support her denial of benefits. *Haim*, No. 90–1031V, slip op. at 9. However, in *Haim* the child was in an automobile accident prior to vaccination, suffered from irritability and sleeplessness prior to vaccination, and did not experience post-vaccination seizures within the Table period.

*Skinner* is equally distinguishable. Respondent stated in its brief: "The Court of Federal Claims has recently held that where the seizures experienced within three days of administration of the DPT vaccine are not 'indicative of a then occurring encephalopathy ... the determination of encephalopathy cannot stand.'" Resp's Br. filed Aug. 4,

---

2. This is because, as the Supreme Court noted, an injury or disease can only have one onset: "There cannot be two first symptoms or onsets of the same injury." *Whitecotton*, —— U.S. at ——, 115 S.Ct. at 1480.

1995, at 13 (quoting *Skinner*, 32 Fed.Cl. at 199). However, respondent did not mention that in *Skinner* the child had pre-vaccination seizures. In addition, the quotation from *Skinner*, is taken out of context. The above quotation begins with the statement: "In the instant case, by contrast, there was no medical testimony to support the conclusion that the seizures which Billy experienced within three days of the administration of the DPT vaccine were indicative of a then-occurring encephalopathy." 32 Fed.Cl. at 199. The court in *Skinner* merely found that petitioner had not produced sufficient medical testimony to support his claim, not that seizures cannot constitute a first symptom of the onset of encephalopathy as a matter of law.

### 5. *Special master's reevaluation of the evidence*

■ This case involves a situation wherein the special master, in her September 9, 1993 decision, originally reached a determination that petitioners did not prove encephalopathy, only later to reverse herself by allowing for recovery for encephalopathy in her December 7, 1993 order and in her September 16, 1994 *sua sponte* "Supplement to Decision." While the special master's July 5, 1995 decision is consistent with her December 1993 and September 1994 decisions, this court recognizes that the special master's assessment of the evidence has changed during the progression of the case.

In an unrelated matter, the Federal Circuit has expressed concern with an "unexplained switch in the trial court's position [that] appears improper under the Law of the Case doctrine." *Florida Rock Industries, Inc. v. United States*, 791 F.2d 893, 899 (Fed.Cir.1986). However, this case does not give rise to such concerns. The special master in two instances was required to reopen the record and reexamine her conclusions based on rulings, first by the Federal Circuit and later by the Supreme Court in *Whitecotton*. In her effort to comply with the law as defined by these two courts, the special master reexamined the evidence. In the process she reevaluated key testimony and determined that petitioners had proved an on-Table encephalopathy. It is true that this finding constitutes a reversal of her original finding in the September 9, 1993 decision, but it is a reversal that is both understandable in light of the circumstances and appropriate considering the duty placed upon the special master to evaluate evidence in accordance with the prevailing legal requirements.

In hindsight the special master, in her September 16, 1994 decision, overread the Federal Circuit's opinion in *Whitecotton* as requiring her to reverse her initial finding that petitioners had not proved the onset of encephalopathy within the Table time period. That was an error. However, when this court remanded the case, it ordered the special master to reexamine the facts in light of the Supreme Court's ruling in *Whitecotton*. *Brown*, No. 90–1769V, slip op. at 5 (Fed.Cl. June 14, 1995). The special master's decision on remand complied with this order and properly applied *Whitecotton*. Since the final determination in this case comports with the law and is consistent with the facts, the court sees no reason to disturb the result.

### CONCLUSION

Accordingly, based on the foregoing, the decision of the special master is sustained. The Clerk of the Court shall enter judgment in accordance with the special master's decision of March 31, 1995.

**IT IS SO ORDERED.**

Costs on review to petitioners.